## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **TORI C. VOLLEY,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **CIVIL ACTION FILE NO.** |
| **v.** | : | **1:07-CV-0138-AJB** |
| | : | |
| **MICHAEL J. ASTRUE,**[1] | : | |
| *Commissioner of Social* | : | |
| *Security Administration*, | : | |
| | : | |
| **Defendant.** | : | |

## O R D E R   A N D   O P I N I O N[2]

Plaintiff Tori C. Volley ("Plaintiff") brought this action pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of the Social Security Administration ("the Commissioner"), denying her application for Disability Insurance Benefits ("DIB") payments under the Social Security Act ("the

---

[1]     Michael J. Astrue, who became Commissioner of Social Security on February 12, 2007, is "automatically substituted" as Defendant.  FED. R. CIV. P. 25(d)(1).

[2]     The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73.  [Doc. 22]. Therefore, this Order constitutes a final Order of the Court.

Act").[3]   For the reasons stated below, the undersigned **RECOMMENDS** that the Commissioner's decision be **REVERSED** and the case be **REMANDED** for the Commissioner for further consideration of Plaintiff's claims as set forth below.

## I.     PROCEDURAL HISTORY

Plaintiff filed an application for DIB on May 6, 2003, alleging disability commencing on November 25, 2002. [Administrative Record (hereinafter "R") 58-60]. Plaintiff's application was denied initially and on reconsideration.  [R27-30, 35-38]. Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"), [R39-40], which was held on November 22, 2005.  [R400-443].  The ALJ issued a partially favorable decision on March 23, 2006, in which he found that prior to July 1, 2005, Plaintiff retained the residual functional capacity ("RFC") to perform work existing in

_____

[3]      Title II of the Social Security Act provides for federal disability insurance benefits.   42 U.S.C. § 401 *et seq*.   Title XVI of the Social Security Act, 42 U.S.C. § 1381, *et seq*., provides for supplemental security income benefits for the disabled.  The relevant law and regulations governing the determination of disability under a claim for DIB are nearly identical to those governing the determination under a claim for SSI.  *Davis v. Heckler*, 759 F.2d 432, 435 n.1 (5th Cir. 1985).  Although different statutes and regulations apply to each type of claim, in general, the legal standards to be applied are the same regardless of whether a claimant seeks DIB, to establish a "period of disability," or to recover SSI, which are not tied to the attainment of a particular period of insurance disability.  *Id.*; *Baxter v. Schweiker*, 538 F. Supp. 343, 350 (N.D. Ga. 1982).  Therefore, to the extent that the Court cites to SSI cases, statutes, or regulations, they are equally applicable to Plaintiff's DIB claims.

2

significant numbers in the national economy but since that date had been unable to sustain work at any exertional level due to psychological limitations. [R23-24]. Plaintiff then sought review by the Appeals Council and on May 31, 2006, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. [R5-8, 13].

Plaintiff filed the instant action in this Court on December 22, 2006, seeking review of the Commissioner's decision. *Tori C. Volley v. JoAnne B. Barnhart,* Civil Action File No. 1:06-CV-1909. [Doc. 2]. The answer and transcript were filed on March 27, 2006. [Docs. 8-9]. The matter is now before the Court upon the administrative record, the parties' pleadings, briefs and oral argument, and is ripe for review § 405(g).

## II.   STATEMENT OF FACTS

### A.   *Factual Background*

Plaintiff was born on March 27, 1961, and was 44 years old at the time of the administrative evidentiary hearing. [R22, 58]. She has a high school education and some college, with past relevant work as a market researcher, mental health technician, and customer service representative. [R74, 107-10, 410]. Plaintiff alleges disability

3

based on depression, anxiety, Post-Traumatic Stress Disorder ("PTSD"), obsessive-compulsive disorder, fatigue and poor concentration.  [R34, 73, 91, 105].

### B.    Medical Records From Treating Physicians

The medical evidence primarily is comprised of records from Phoenix Psychological Associates, Behavioral Solutions, Inc., DeKalb Community Services Board Mental Health - Developmental Disabilities and Addictive Diseases Services, and consultative examinations and evaluations.

From July 1995 through August 2000, Plaintiff was treated at Phoenix Psychological Associates.  [R235-270].  Plaintiff was seen in regular psychotherapy sessions conducted by therapist Norma K. Cloe, LMFT (licensed marriage and family therapist).  These records reflect that Plaintiff experienced absences from work due to her conditions.  [See R264-65].[4]  On a Mental Impairment Questionnaire dated February 9, 2004, Ms. Cloe diagnosed Plaintiff with PTSD, acute, with delayed onset; obsessive-compulsive disorder; and depersonalization disorder.  She described the onset of these disorders as "mid-twenties."  She noted as significant background factors that Plaintiff was molested by her babysitter as a young child, that her mother tried to

---

[4]    The record additionally reflects that from May through August, 2000, Plaintiff also was seen by Seth Pope, M.D., a psychiatrist.  [R151-58, 239].

smother her with a pillow and deliberately scared her, her father abused her, and both parents were very critical of her and called her names. Plaintiff described hiding in a closet "a lot." Ms. Cloe wrote symptoms of these disorders were Plaintiff's fighting at school between the age of 6 and 12, suicidal thoughts, unhealthy relationships with men, hallucinations, flashbacks, dissociation, an eating disorder, work problems and inability to trust or bond with other women. Ms. Cloe noted that Plaintiff received group and individual therapy during her five years of treatment by Ms. Cloe, and that she had been placed on psychiatric medications and monitored by Drs. Seth Pope and Derrell L. Ray. At the time Plaintiff was treated by Ms. Cloe, "she functioned some of the time and was impaired by depression & dissociative disorder some of the time." [R244].

Ms. Cloe recorded Plaintiff's report of at times feeling paranoid, isolated, disconnected and distrustful, and at times experiencing disorientation and auditory hallucinations. While Ms. Cloe noted that Plaintiff was adequately groomed, during the period of these observations, Plaintiff was often unable to communicate and stay focused. She described Plaintiff's attitude towards therapy as usually positive, but noted that she was frustrated or angry because she "wasn't improving at a pace." Ms. Cloe did not notice any psychomotor behavior such as agitation, tics, tension or

AO 72A
(Rev.8/8
2)

tremors, or any speech impairment.  She thought that Plaintiff's expression/affect "was appropriate to the painful material she was attempting to process."  [R243].

Ms. Cloe also observed that Plaintiff generally was coherent on in sessions, and her thought content during therapy was appropriate.  Plaintiff's repressed and dissociated memories were restored during therapy.  Plaintiff reported impaired attention and focus, which Ms. Cloe associated with the effects of PTSD and depression.  [R242].

From August 2000 through December 2002, Plaintiff was seen regularly by Dr. Ray, a psychiatrist, at Behavioral Solutions, Inc.  [R206-33].  These records document Plaintiff's symptoms and the psychotropic medications she was prescribed, which included Topamax, Paxil, Trazadone, and Effexor.  [*Id.*].  During his initial evaluation, Dr. Ray diagnosed Plaintiff on Axis I[5] with Anxiety Disorder NOS (noting

---

[5]      According to the chapter on "Multiaxial Assessment" in *Diagnostic and Statistical Manual of Mental Disorders*, DSM-IV-TR (4th ed. 2000):

A multiaxial system involves an assessment on several axes, each of which refers to a different domain of information that may help the clinician plan treatment and predict outcome.  There are five axes included in the DSM-IV multiaxial classification:

Axis I:  Clinical Disorders, Other Conditions That May Be a Focus of Clinical Attention
Axis II:  Personality Disorders, Mental Retardation

AO 72A
(Rev.8/8
2)

anxiety attacks) and General Anxiety Disorder; no diagnosis on Axes II or III;

Axis IV, "Other psychosocial and environmental problems"; and on Axis V, a current

and past year GAF score of 50.[6]  [R231].  In the mental status exam form, Dr. Ray

_____

             Axis III:  General Medical Conditions
             Axis IV:  Psychosocial and Environmental Problems
             Axis V:  Global Assessment of Functioning

        The use of the multiaxial system facilitates comprehensive and
systematic evaluation with attention to the various mental disorders and
general medical conditions, psychosocial and environmental problems,
and level of functioning that might be overlooked if the focus were on
assessing a single presenting problem. A multiaxial system provides a
convenient format for organizing and communicating clinical information,
for capturing the complexity of clinical situations, and for describing the
heterogeneity of individuals presenting with the same diagnosis.  In
addition, the multiaxial system promotes the application of the
biopsychosocial model in clinical, educational, and research settings.

*Diagnostic and Statistical Manual of Mental Disorders* ("DSM-IV-TR") (4th ed. 2000)
at 27.

       [6]      The GAF (Global Assessment of Functioning) rates an individual's overall
level of psychological, social, and occupational functioning.  *Lozado v. Barnhart*,
331 F. Supp. 2d 325, 330 n.2 (E.D. Pa. 2004) (citing *Diagnostic and Statistical Manual
of Mental Disorders* (4th Ed.) ("DSM-IV" at 32)).  The GAF ranges:

        from 0 to 100 and is divided into 10 ranges of functioning, requiring the
examiner to pick a value that best reflects the individual's overall level of
functioning using either symptom severity or functioning. . . . Each range
can be described as follows: . . .; a GAF score of in the range of 41-50
indicates "serious symptoms (e.g. suicidal ideation, severe obsessional
rituals, frequent shoplifting) OR any serious impairment in social,

AO 72A
(Rev.8/8
2)

described her appearance as neat but her face was tense.  She was cooperative but distractible and had difficulty concentrating; her mood was depressed and anxious; her speech was normal and she was oriented to date, place, person and situation ("oriented x4"); her memory was within normal limits; but her thought process was obsessional. She reported irregular sleeping patterns and problems going to sleep.  No hallucinations were reported, and her energy level and motivation were normal.  [R229-30].[7]

On the next visit, September 26, 2000, Dr. Ray reported some progress, in that Plaintiff's attention was on target, but otherwise, Plaintiff still was anxious, with "feelings of doom," and problems sleeping ("real anxious @ nighttime").  Since she reported no difference since starting Paxil, Dr. Ray increased her dosage.  [R228]. On October, 24, 2000, Dr. Ray found Plaintiff's attention better and her anxiety decreased.  Her sleep was better with the medication, but she had increased anxiety

_____

occupational, or school functioning (e.g. no friends, unable to keep a job);" a GAF score in the range of 51-60 indicates "moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or coworkers);" . . . .

*Lozado*, 331 F. Supp. 2d at 330 n.2 (internal citations omitted) (citing DSM-IV at 32, 34).

[7]        Plaintiff also reported that she had a substance abuse problem with cocaine, but had been "clean since 1986."  [R229].

8

around her cycle.  He again increased the Paxil dosage.  [R227].  However, on December 5, 2000, Dr. Ray recorded that Plaintiff felt "out of control" and that "I'm terrible," as well as noted her continued weight gain and her ingestion of laxatives (75 pills in one month) and throwing up in order to attempt to lose weight.  [R226].

Plaintiff reported doing "okay" between January and May, 2001, except for concerns about her weight, asking for a referral for a therapist and stating that the Topamax was not working anymore.  [R221-25].  On June 19, 2001, Plaintiff reported "doing really bad," and complained of physical problems, problems sleeping and depression.  Dr. Ray described her facial expressions as flat, and as having difficulty in concentration, a depressed mood, impaired recent memory, decreased energy/activity and being anhedonic.  [R220].

Plaintiff reported feeling much better on August 14, 2001, [R219], and September 18, 2001, [R218], but on October 18, 2001, she complained that she was "not too good," the Paxil had stopped working, and she felt dizzy, unmotivated, and anxious.  [R217].  Dr. Ray noted that while she was smiling, cooperative, alert and her sleep and appetite were good, Plaintiff also was distractible, anxious, her memory was impaired and her energy was decreased.  [*Id.*].  He decreased her Paxil, because she claimed it was not working as well as before, and started her on Effexor.  [*Id.*].

9

On November 6, 2001, Plaintiff described herself as "horrible," stated she had the "worst two weeks of my life" and had called the on-call doctor. She complained of dizziness, being off-balance, and described her mood as 3 on a 1 to 10 scale. Dr. Ray found her tense, irritable, distractible and anxious. [Doc. 216]. Upon follow-up on November 27, 2001, Plaintiff stated she felt dizzy and lightheaded when she tried to stop the Paxil. [R215].

On January 15, 2002, Dr. Ray noted that Plaintiff appeared tense and depressed and rated her mood as 4.5 out of 10. He found her tense, depressed, with poor eye contact, but otherwise average or within normal limits. He increased her Effexor and restarted the Topamax. [R214]. The March 28, 2002, session found her "lousy," with her anxiety and obsession "back." Plaintiff stated that she talked in her sleep. While a number of categories in the mental status exam were noted as average, within normal limits or on target, Dr. Ray also found Plaintiff to be tense, depressed, and anxious. [R213].

On April 25, 2002, Plaintiff reported that she was "horrible still," and still anxious, talking in her sleep, obsessive and depressed. She additionally stated she was angry and hostile, but not suicidal. The Effexor made her sleepy. She sought a

AO 72A
(Rev.8/8
2)

prescription for Viagra.  Dr. Ray noted that she had had auditory hallucinations in the past.  He discontinued her Trazadone and started her on Risperdal.  [R212].

On May 23, 2002, Plaintiff complained that she was sleeping all the time and wanted to stop the Effexor.  She also stated that the Risperdal made her nervous, and the Topamax was not working.  Dr. Ray found her relaxed but sad, guilty, anxious, depressed (4 on a 10 scale), and having obsessive thinking and decreased energy.  He decreased the Effexor, increased the Topamax, and prescribed Celexa, Viagra and Sominex.  [R211].  On June 27, 2002, Plaintiff reported doing better but sleeping all the time.  Dr. Ray found her depressed, decreased the Effexor and increased the Celexa.  [R210].  He found her improved on July 25, 2002.  [R209].  However, on August 22, 2002, Plaintiff complained of anxiety, which she attributed to the medication, and Dr. Ray found her anxious with difficulty concentrating.  [R208].  Then, in the October 10, 2002, session, Plaintiff stated she was "doing great" due to the increase in medications.  The same sheet indicates that Plaintiff "slept through" her scheduled appointment for November 13, 2002, bur telephonically reported experiencing depression.  [R207].

On November 26, 2002, Dr. Ray completed a questionnaire indicating that he saw Plaintiff every four to eight weeks for monitoring and medication management for

11

diagnoses of Generalized Anxiety Disorder and Major Depression Recurrent, Severe. [R386-88]. He indicated, however, that Plaintiff was not "incapacitated" and was able to work. [*See* R386-87].

Finally, on December 6, 2002, Plaintiff reported to Dr. Ray that she had a nerve injury and appeared to be anxious about her ability to get her work done; he quoted her as reporting, "If I don't get papers filled out I will get fired." She stated that she experiences depression in that "I go thr[ough] dark periods, but I'm okay now." Her motivation was decreased and she stated she was sorry for being lazy. She reported that it scares her when she goes through these periods and cannot get out of bed. Dr. Ray found her eye contact poor, noted that she was depressed and again gave a diagnosis of "Major Depression, Severe, Recurrent." [R206].

Medical records dated from February 2003 through January 29, 2004, indicate that Plaintiff was seen at the DeKalb Community Services Board by Drs. Malcolm G. Bowen and D. Siddappa. [R196-205, 390]. Her medications included Topamax, Celexa, Wellbutrin, Trazadone, Klonopin, and Lexapro. [*See id.*]. Dr. Bowen's notes consist mainly of notations regarding medication adjustments. [*Id.*]. However, he also observed that Plaintiff suffered from poor concentration in May 2003, [R203]; was nervous and depressed in August 2003, [R199]; and had "some anxiety

[free floating]" and continued insomnia in December 2003.  [R198].  On January 29, 2004, Plaintiff reported feeling "too sedated with 20 mgs [L]exapro, loss of libido, cont[inued] anxiety," so Dr. Bowen reduced her medication.  [R196].

Dr. Bowen's narrative notes were recorded on a form entitled "Consumer Status Note," which also asked for a description of various aspects of Plaintiff's mental status as "remarkable" or "unremarkable" by checking the appropriate box.  Thus, on August 14, 2003, Dr. Bowen noted that Plaintiff's affect, thought process, orientation and behavior were unremarkable, and she was not a danger to herself, others or property, but that her mood was depressed.  [R199].[8]

On October 9, 2003, Dr. Bowen found only her behavior remarkable, with a notation of her being anxious.  [R198].  On December 4, 2003, Dr. Bowen noted that all her mental status categories were unremarkable, observing additionally that she was stable with "no major depressive symptoms."  [R197].  On January 29, 2004, all of Plaintiff's mental status categories were marked "unremarkable."  [R196].

On October 11, 2005, Dr. D. Siddappa,  a DeKalb Community Service Board psychiatrist, completed a "Mental Impairment Questionnaire (RFC & Listings)." [R374-79].  He indicated that Plaintiff suffered from Major Depression, Severe and had

---

[8]         Another notation next to the word "depressed" is unintelligible.

13

a GAF of 49.[9]  He noted symptoms, including: appetite disturbance, sleep disturbance, personality change, mood disturbance, emotional lability, delusions or hallucinations, social withdrawal, blunt, flat or inappropriate affect, decreased energy and obsessions or compulsions, persistent irrational fears, difficulty thinking or concentrating and feelings of guilt/worthlessness.  [R374-75].  He remarked that Plaintiff was not a malingerer. [R375].  He listed her medications as Prozac, Seroquel, Klonopin, and Paxil, and also noted that she experienced side effects from the medications, including sedation, decreased concentration, impairment of judgment and fine motor skills. [R376].  He estimated that Plaintiff's conditions would cause more than three absences a month from work.  [R377].

Under "Mental Abilities and Aptitude Needed to Do Unskilled Work," Dr. Siddappa marked that Plaintiff had poor or no ability to remember work-like procedures, maintain attention for two hour segments, maintain regular attendance, make simple work-related decisions, accept instructions and respond appropriately to

_____

[9]     "[A] GAF of 41 through 50 is characterized by *serious* symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job).  *Matthews v. Barnhart*, 347 F. Supp. 2d 1093, 1097 (M.D. Ala. 2003) (citing *American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 1994)); *see also* note 6.

14

criticism from supervisors and a fair ability to understand, remember and carry out short and simple instructions and get along with co-workers and peers.  [R377].  He concluded that Plaintiff's mental ability and aptitude to perform semi-skilled and skilled work was poor.  [R378].  Dr. Siddappa also observed that Plaintiff had marked limitations in restriction of activities of daily living, difficulties in maintaining social functioning; frequent deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner; and could expect three or more episodes of deterioration or decompensation in work or work-like settings.[10]  [R379].

On November 18, 2005, Dr. Siddappa wrote a letter in which he stated that Plaintiff began treatment with the DeKalb Community Service Board on January 29, 2003, and had been diagnosed with Major Depressive Disorder (295.33), Obsessive Compulsive Disorder (300.3), and Bulimia Nervosa (307.51).  [R390].  Plaintiff's symptoms included depression, anxiety, obsessive compulsive behaviors, and binge eating and purging. [*Id.*].  Dr. Siddappa further wrote:

---

[10]     The form provided that "[m]arked means more than moderate, but less than extreme.  A marked limitation may arise when several activities or functions are impaired or even when only one is impaired, so long as the degree of limitation is such as to seriously interfere with the ability to function independently, appropriately and effectively."  [R379].

15

During my meeting with Ms. Volley on today, she was cooperative and appeared quite distressed about her pattern of eating ashes, binge eating food and purging with laxatives. She was tearful during a good part of the session, asking if she can ever overcome these problems. When asked about a sore on her face, she said it began as pimples about a year ago and that she developed a pattern of picking it, resulting in a noticeable sore. Anxiety was also evidenced by repetitive shaking of her leg and picking at her nails.

I do not believe that Ms. Volley is malingering, but that she is truly experiencing the symptoms noted above, and that these symptoms are a source of considerable distress for her.

[R390].[11]

C.      Consultative Examinations

The State agency processing Plaintiff's disability application referred Plaintiff for two consultative examinations. On September 10, 2003, Dr. Arleen Turzo evaluated Plaintiff. [R173-77]. Plaintiff reported her symptoms as consisting of an arm injury, depression, "severe anxiety," panic attacks, difficulty concentrating, poor memory and difficulty following through with tasks. She further claimed to experience bulimia, difficulty sleeping, feeling "scared at night," forgetfulness and being

---

[11]     Hospital records from Grady Health Care System, dated from March to September 2003, also document left arm pain complaints and treatment; treatment for a "markedly enlarged" left uterine artery and a diminutive right uterine artery with fibroid tumors; and asthma and bronchitis. [*See* R160-72, 290-93, 298-314, 317-62]. However, these conditions do not seem to be at issue in Plaintiff's disability benefits claim.

16

"terrified" to make phone call or meet people.  [R173-74].  Plaintiff reported that she did not have friends because she could not sustain relationships.  She was able to prepare simple meals, perform housekeeping, do laundry and grocery shopping and handle her own finances.  [R174].

During the mental status examination, Dr. Turzo observed that Plaintiff's speech was slow; she appeared to be of below average to average intelligence; she had a restricted affect; she seemed nervous; she appeared to be on the verge of tears; she had an indifferent mood; and that she had apparent short-term memory deficits.  However, her associations were logical and thought content was appropriate.  [R 175].

Dr. Turzo diagnosed Major Depression, Recurrent, Moderate to Severe (296.32); Bulimia, Purging Type (307.51); and Panic Disorder Without Agoraphobia (300.01). [R176].  She opined that it was likely that Plaintiff's psychological problems began at an early age, and her "psychological condition with current treatment is guarded to poor."  [Tr. 176].  Dr. Turzo also indicated that Plaintiff would likely: require monitoring due to memory and concentration lapses; have difficulty maintaining regular attendance; demonstrate depressed mood; have periodic anxiety attacks; demonstrate low tolerance for stress.  Her concentration was rated as fair.  She also found that Plaintiff had the intellectual ability to perform mildly-detailed tasks and

17

"would probably be able to follow simple to mildly-detailed instructions satisfactorily." [*Id.*].

On August 15, 2005, Dr. Margo King conducted a three hour psychological consultation, which included a battery of testing instruments, presumably administered by psychometrist Sarah Golsen, M.A. [R365-70]. Plaintiff reported to Dr. King that she had flashbacks of verbal abuse by her mother; was paranoid about hearing voices again; felt so lonely that at times she made random phone calls just to hear a voice; experienced anxiety attacks; and felt "on edge, terrified, scared, and hypervigilant." [R366]. Dr. King observed that Plaintiff did not exhibit any "evidence of difficulties with anxiety," and that her "thinking was clear," but that her "affect was inappropriate to her speech, such that she expressed no emotion, even when speaking about past abuse and eating disorders in which she eats ashes and takes laxatives." [R367].

Testing results revealed that Plaintiff had a borderline range of intelligence, and that the significant difference between her Verbal IQ score of 95 and her Performance IQ score of 69, suggested that "her verbal skills are significantly stronger than her performance skills." [R367-68]. Dr. King also noted that Plaintiff's adaptive abilities were in the "extremely low range" and that scores on the State-Trait Anxiety Index ("STAI") and Hamilton Depression Inventory ("HDI") were "considered statistically

significant for anxiety and depression, respectively."  She further noted, however, that "clinical impression based on behavioral observation suggests that [Plaintiff] may be exaggerating symptoms in an attempt to receive benefits, and is likely not experiencing clinically significant anxiety or depression."  [R369].   Dr. King opined that Plaintiff could "understand and carry out simple instructions and is able to communicate effectively."  [R370].  She concluded that "a diagnosis of malingering is appropriate." [*Id.*].  The psychometrist completed an assessment form indicating that Plaintiff would have fair ability to deal with work stresses; maintain attention/concentration; and fair ability in demonstrating reliability but good ability to follow work rules, relate to co-workers, deal with the public, use judgment, interact with supervisors, and function independently.  [R371-72].[12]

D.      *State Agency RFC Assessments*

On  September  29,  2003,  Dr.  John  Hollender,  a  State  agency  consulting psychologist, completed Psychiatric Review Technique ("PRTF") and Mental RFC ("MRFC") forms.  [R178-95].  In these forms, he indicated that Plaintiff suffered from depression, anxiety, and bulimia, which caused moderate limitations in her ability to

---

[12]      The form, entitled "Medical Assessment of Ability to Do Work-Related Activities (Mental)," defined "Fair" as "[a]bility to function in this area is limited but satisfactory."  [[R371].

19

(1) maintain social functioning, (2) complete a normal work day and work week, and (3) interact appropriately with the general public. [R179, 185, 187, 192]. Under the "Rating of Functional Limitations, B Criteria of the Listings," Dr. Hollender wrote that Plaintiff experienced (1) mild restrictions in activities of daily living, (2) mild difficulties in maintaining concentration, persistence or pace, and (3) would experience no episodes of decompensation. [R192].

On February 17, 2004, Dr. Allen Carter completed a second assessment. [R271-84]. Dr. Carter noted that Plaintiff's depression was characterized by psychomotor agitation, decreased energy, feelings of guilt or worthlessness, and difficulty concentrating, [R274], and that she experienced an anxiety-related disorder which caused recurrent obsessions and intrusive recollections which are a source of marked distress. [R276]. In the "Rating of Functional Limitations" section, under "B" Criteria of the Listings, he noted mild restrictions of activities of daily living, moderate limitations in maintaining social functioning and in maintaining concentration, persistence or pace and no episodes of decompensation. [R281]. On the MRFC assessment form, [R285-86], Dr. Carter specified that Plaintiff would be moderately limited in ability to: carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain

AO 72A
(Rev.8/8
2)

regular attendance, and be punctual within customary tolerances; complete a normal work day and work week; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and in ability to get along with co-workers without distracting them. [*Id.*].

E.       *Evidentiary Hearing Before the Social Security ALJ*

An evidentiary hearing was held before the ALJ on November 22, 2005. [R402]. Plaintiff was forty-four years old at the time of the hearing. She testified that she has a high school education and one and one-half years of college. She worked as a customer service representative for fifteen years at Quest Laboratories until November 2002. [R410]. Plaintiff testified that she was terminated because of too many absences due to depression after her father had a heart attack. [R410-11].

Plaintiff further testified that she received unemployment benefits for the maximum amount of time permitted - - approximately one year - - after she was terminated from Quest. [R411-12]. She understood that in order to qualify for unemployment benefits, the recipient had to certify that she is able and willing to work, and that she "figured that [she] could probably do something that wasn't as stressful as the customer service at Quest, something different and low key . . . ." [R412]. Plaintiff testified that she was unable to work at the time of the hearing because of anxiety

attacks and a condition which caused her to eat cigarette ashes all day.  [R412-13].

Plaintiff further stated that she was not able to concentrate for long periods of time.

[R413].  She claimed to binge and purge about three times a week and compulsively

use laxatives.  [R414].

Plaintiff explained that at one point in time she had left hand pain, but the

condition had resolved.  Also, bleeding from a uterine artery embolism had improved.

[R413-14].  Plaintiff also testified that her asthma and bronchitis were controlled

through the use of inhalers.  [R414].

Plaintiff testified that she once had to take off from work due to hearing voices

in her head.  [R416].

Also, Plaintiff stated that she felt "sort of out of it the next day" after taking her

Seroquel and reported that she also took Prozac, Laevis, Risperdal, and Klonopin.

[R416-17].  She claimed the need to lie down for about three hours during the day for

the past six to nine months.  She denied being able to shop or go to church, and stated

that she did not have friends or hobbies.  [R418-19].

Upon questioning by her attorney, Plaintiff testified that she took short-term

disability during the time of her father's heart attack and when she heard voices in her

head.  [R419-20].  Plaintiff explained that one of the reasons that she believed that

22

Quest did not challenge her receiving unemployment is because the company did not process her FMLA paperwork correctly and may have improperly fired her. [R420-21]. In regard to her receipt of unemployment benefits, Plaintiff further explained that she was not seeking full-time employment at the time but, rather, was seeking a less stressful, part time job. [R424]. But, she testified, she could not have worked full-time during this period because of depression. [R424-25]. She claimed that she filed for disability when she realized that she was not getting any better and she doubted that she could work. [R431-32].

Plaintiff testified that she could experience an anxiety attack at any time and that anxiety could cause her to "pick" and cause scars on her body. [R426]. She stated that she found it difficult to be around other people and that it was also difficult for her to go places because she gets an "overwhelming feeling." [R427]. She also testified that her medications make her tired and sleepy. [R428].

In posing his first hypothetical question to the vocational expert ("VE"), the ALJ referenced Dr. Carter's evaluation, stating the following limitations:

> Claimant would not be significantly limited in understanding and memory, that she would have difficulties the same in concentration for complex tasks but should be able to sustain concentration for simple tasks, has not lost substantial ability to sustain concentration, has reduced ability to interact with large groups of co-workers and supervisors if there's not lost

23

substantial ability to interact appropriately. . . .   Not significant and limited in adaptation. . . .

[R435-36].  In responding to whether these limitations were "consistent or inconsistent with the Claimant during her past work," the VE stated that such a description did not fit the job of customer service representative (Plaintiff's past work), but would allow for unskilled work with those restrictions, to perform as an addresser, rating clerk, or surveillance system monitor.  [R126, 436-37].  However, if a person needed one day per week for treatment or therapy, or had the functional capacity described in Dr. Siddappa's assessment (Exh. 15F), she could not sustain any work.  [R437, 438-40].

## III.   ALJ'S FINDINGS OF FACT

The ALJ made the following findings of fact:

1.   The claimant meets the non-disability requirements for a period of disability and Disability Insurance Benefits set forth in § 216(i) of the Social Security Act and is insured for benefits as of the established onset date.

2.   The claimant has not engaged in substantial gainful activity since July 1, 2005.

3.   The medical evidence establishes that the claimant has the following "severe" impairments: major depressive disorder, obsessive compulsive disorder, and bulimia nervosa.

24

4.    The claimant has no impairment that meets or equals the criteria of any impairment listed in Appendix 1, Subpart P, Regulations No. 4.

5.    The claimant's assertions concerning her ability to work are not entirely credible for the period prior to July 1, 2005. Since July 1, 2005, her allegations are credible.

6.    Prior to July 1, 2005, claimant retained the residual functional capacity to understand, remember and carry out simple work instructions; she had difficulty sustaining concentration for complex tasks, but she was able to sustain concentration for simple tasks. She had no substantial loss of the ability to interact appropriately with large groups, co-workers, and supervisors prior to July 1, 2005. Since July 1, 2005, she has, inter alia, been unable to sustain work at any exertional level due to psychological limitations. She has poor or no ability to maintain attention for a two-hour segment of time; remember work-like procedures; maintain regular attendance within customary tolerances; sustain an ordinary routine without special supervision; make simple work-related decisions; perform at a consistent pace without unreasonable rest periods; respond appropriately to changes in a routine work setting; and accept instructions and criticisms from supervisors.

7.    The claimant is unable to perform the requirements of her past relevant work.

8.    The claimant's non-exertional limitations significantly narrow the range of work she can perform.

9.    On November 25, 2002, and July 1, 2005, the claimant was a younger individual age 18-44.

10.    The claimant has at least a high school education.

25

11.     The claimant has a semi-skilled work background, but has no transferable skills within her present residual functional capacity.

12.     Considering claimant's non-exertional limitations, she could not make an adjustment to any work that exists in significant numbers in the national economy as of July 1, 2005; a finding of disabled is therefore reached under the medical-vocational guidelines, guided by vocational expert testimony and the provisions of Social Security Ruling 96-8p.  Prior to July 1, 2005, claimant was able to perform other work existing in significant numbers in the national economy.  This finding is made within the framework of medical-vocational rule 204.00, and is guided by vocational expert testimony.

13.     The claimant has been under a disability, as defined in the Social Security Act, since July 1, 2005(20 CFR 404-1520(g)).

[R23-24].

The ALJ found that Plaintiff had medically determinable "severe" impairments of major depression, obsessive compulsive disorder and bulimia nervosa but, accepting the opinions of the reviewing state agency physicians and psychologists, Plaintiff did not meet or equal any listing.  [R19-20].  The ALJ took administrative note of the fact that Plaintiff received unemployment benefits which "does not dictate a finding that a recipient is not disabled [but] . . . is evidence indicating work capacity."  [R20].  He further observed that from November 2002 through 2003, Plaintiff had "sporadic mental health treatment" and was stable in the fall of 2003.  He observed that Dr. King

26

thought that Plaintiff was malingering but accorded greater weight to Dr. Siddappa's finding that Plaintiff was not malingering.  [R21].

The ALJ found that Plaintiff could not perform any of her past relevant work but from November 25, 2002, through June 2005, Plaintiff retained the residual functional capacity to perform unskilled work.  [R23].  He noted, however, that Plaintiff was unable to perform work at any exertional level three months prior to Dr. Siddappa's opinion written in October 2005.  Thus, the ALJ found Plaintiff disabled as of July 1, 2005.  [R21, 23].

## IV.   STANDARD FOR DETERMINING DISABILITY

An individual is considered disabled for purposes of disability benefits if she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically accepted clinical or laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do previous work but cannot, considering age, education, and work experience, engage in any other kind of

substantial  gainful  work  which  exists  in  the  national  economy.

42 U.S.C. §§ 423(d)(2)-(3).

The burden of proof in a Social Security disability case is divided between the claimant and the Commissioner.  The claimant bears the primary burden of establishing the  existence  of  a  "disability"  and  therefore  entitlement  to  disability  benefits. *See* 20 C.F.R. § 404.1512(a).  The Commissioner uses a five-step sequential process to  determine  whether  the  claimant  has  met  the  burden  of  proving  disability. *See* 20 C.F.R. § 404.1520(a); *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001); *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999).  The claimant must prove at step one  that  she  is  not  undertaking  substantial  gainful  activity.   *See*  20  C.F.R. § 404.1520(b).  At step two, the claimant must prove that she is suffering from a severe impairment  or  combination  of  impairments  which  significantly  limits  her  ability  to perform basic work-related activities.   *See* 20 C.F.R. § 404.1520(c).  At step three, if the impairment meets one of the listed impairments in Appendix 1 to Subpart P of Part 404 (Listing of Impairments), the claimant will be considered disabled without consideration of age, education and work experience.  *See* 20 C.F.R. § 404.1520(d). At step four, if the claimant is unable to prove the existence of a listed impairment, she must  prove  that  the  impairment  prevents  performance  of  past  relevant  work.

28

*See* 20 C.F.R. § 404.1520(e).  At step five, the regulations direct the Commissioner to consider the claimant's residual functional capacity, age, education and past work experience to determine whether the claimant can perform other work besides past relevant work.  *See* 20 C.F.R. § 404.1520(f).  The Commissioner must produce evidence that there is other work available in the national economy that the claimant has the capacity to perform.  In order to be considered disabled, the claimant must prove an inability to perform the jobs that the Commissioner lists.  *Doughty*, 245 F.3d at 1278 n.2.

If at any step in the sequence a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends.  *See* 20 C.F.R. §§ 404.1520(a) and 416.920(a).   Despite the shifting of burdens at step five, the overall burden rests upon the claimant to prove that she is unable to engage in any substantial gainful activity that exists in the national economy.  *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983).

## V.    SCOPE OF JUDICIAL REVIEW

The scope of judicial review of a denial of Social Security benefits by the Commissioner is limited.  Judicial review of the administrative decision addresses three questions:  (1) whether the proper legal standards were applied; (2) whether there was

AO 72A
(Rev.8/8
2)

substantial evidence to support the findings of fact; and (3) whether the findings of fact resolved the crucial issues.  *Fields v. Harris*, 498 F. Supp. 478, 488 (N.D. Ga. 1980). This Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  If supported by substantial evidence and proper legal standards were applied, the findings of the Commissioner are conclusive. *Lewis v. Callahan*, 125 F.3d 1436, 1439-40 (11th Cir. 1997); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987); *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).  "Substantial evidence" means more than a scintilla, but less than a preponderance.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and it must be enough to justify a refusal to direct a verdict were the case before a jury.  *Richardson v. Perales*, 402 U.S. 389 (1971); *Hillsman*, 804 F.2d at 1180; *Bloodsworth*, 703 F.2d at 1239.  "In determining whether substantial evidence exists, [the Court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  In contrast, review of the ALJ's

AO 72A
(Rev.8/8
2)

application of legal principles is plenary. *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995); *Walker*, 826 F.2d at 999.

## VI.   CLAIMS OF ERROR

Plaintiff contends that the ALJ's decision was erroneous in five ways: by failing to (1) comply with Social Security Ruling (SSR) 83-20 regarding the onset date of her disability; (2) provide any reasons for his implicit rejection of the opinion of Dr. Siddappa that Plaintiff's depression met the criteria of Listing 12.04; (3) comply with the required technique for analyzing mental impairments under 20 C.F.R. § 404.1520a; (4) address the side effects of Plaintiff's medications; and (5) correctly assess Plaintiff's credibility.

## VII.   DISCUSSION

### A.   *Requirement to Call a Medical Advisor under SSR 83-20*

Plaintiff contends that the ALJ committed legal error by failing to obtain medical expert assistance to infer the onset date of her mental impairments. Plaintiff argues that the ALJ arbitrarily selected her onset ate of disability as July 1, 2005, a date three months prior to the date of Dr. Siddappa's mental impairment questionnaire in which Dr. Siddappa found mental limitations precluding competitive employment. Plaintiff argues that SSR 83-20 requires that the ALJ obtain the advice of a medical advisor

31

when determining the onset date of progressive impairments such as Plaintiff's, and contends that this case should be remanded so that the ALJ can obtain medical advisor testimony in order to correctly determine Plaintiff's onset date.  [Doc. 13 at 13-15].

The Commissioner responds that the ALJ properly determined Plaintiff's onset date.  The Commissioner argues that Plaintiff's impairment was not progressive in nature and that the evidence prior and subsequent to her onset date is sufficiently clear so that a medical advisor was not required.  [Doc. 17 at 4-7].

The Court finds that the medical evidence was ambiguous as to Plaintiff's onset date and, pursuant to SSR 83-20, the ALJ should not have inferred an onset date without consulting a medical advisor.

AO 72A
(Rev.8/8
2)

SSR 83-20[13] provides that in the case of the onset of disabilities of non-traumatic origin, the ALJ should consider the applicant's allegations, work history and "medical and other evidence." SSR 83-20. It further provides that:

> With slowly progressive impairments, it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling. Determining the proper onset date is particularly difficult, when, for example, the alleged onset and the date last worked are far in the past and adequate medical records are not available.

*Id.* "In determining the date of onset of disability, the date alleged by the individual should be used if it is consistent with all the evidence available" but "the established onset date must be fixed based on the facts and can never be inconsistent with the medical evidence of record." *Id.* Determining the proper onset date may be "critical."

_____

[13] *See* Social Security Administration website, http://www.socialsecurity.gov/OP_Home/rulings/di/01/SSR83-20-di-01.html (last visited March 20, 2008).

"Social Security Rulings are agency rulings 'published under the authority of the Commissioner of Social Security and are binding on all components of the [Social Security] Administration.' " *Sullivan v. Zebley*, 493 U.S. 521, 530 n.9 (1990) (quoting 20 C.F.R. § 422.408 (1989)). On the other hand, agency rulings "do[ ] not bind this [C]ourt." *Miller v. Commissioner of Social Sec.*, 246 Fed. Appx. 660, 662 (11th Cir. 2007) (quoting *B.B. v. Schweiker*, 643 F.2d 1069, 1071 (5th Cir. Unit B Apr. 27, 1981)). " 'Rulings do not have the force and effect of the law or regulations but are to be relied upon as precedents in determining other cases where the facts are basically the same. A ruling may be superceded, modified, or revoked by later legislation, regulations, court decisions or rulings.' " *Id.* (quoting *Heckler v. Edwards*, 465 U.S. 870, 874 n.3 (1984)); *see also Tauber v. Barnhart*, 438 F. Supp. 2d 1366, 1377 n.6 (N.D. Ga. 2006).

33

*Id.* "[I]t may affect the period for which the individual can be paid and may even be determinative of whether the individual is entitled to or eligible for any benefits." *Id.*

The Ruling gives specific directives regarding cases that require an inference be made as to the onset date:

Precise Evidence Not Available - - Need for Inferences

In some cases, it may be possible, based on the medical evidence to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination, e.g., the date the claimant stopped working. *How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case. This judgment, however, must have a legitimate medical basis. At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred.* If there is information in the file indicating that additional medical evidence concerning onset is available, such evidence should be secured before inferences are made.

*Id*. (emphasis added).

In the hearing, the ALJ acknowledged that he was required to use the testimony of a medical expert ("ME") or medical advisor to determine Plaintiff's onset date. The ALJ stated:

I'm going to go ahead with the hearing today, but I have mixed thoughts about it, because I have a conflict of evidence from Dr. King . . . and what we got in from Dr. Siddappa . . . [T]here's an onset date issue I'm going to have to deal with, and if I have to infer an onset date, I've been told in remands that I have to use an ME.

34

[R405].  In the decision, however, the ALJ inferred an onset date based solely on the record evidence.  [*See* R19-23].

Initially, the Court addresses the Commissioner's argument that Plaintiff's mental conditions were not progressive.  Other courts addressing this issue, however, have characterized psychiatric impairments, such as experienced by Plaintiff, to be progressive in nature.  *See Blea v. Barnhart,* 466 F.3d 903, 911 (10th Cir. 2006) (dysthymia treated as a progressive impairment); *Walton v. Halter,* 243 F.3d 703, 705 (3d Cir. 2001) (bi-polar disorder a slowly progressive impairment); *Spellman v. Shalala,* 1 F.3d 357, 362 (5th Cir. 1993) (depression and anxiety treated as slowly progressing impairment); *Quarles v. Barnhart*, 178 F. Supp. 2d 1089, 1095 n.8 (N.D. Cal. 2001) (noting that "[t]he onset date of physical impairments is generally not of the same gradual and progressive nature as is the case with mental impairments, which often require the assistance of a medical expert.").

In addition to the above-cited case law, in the present case, the record as a whole supports a conclusion that Plaintiff's psychological impairments, such as depression, anxiety, and obsessive-compulsive disorders, were progressive.  Plaintiff was noted as stable earlier during treatment but the severity of the symptoms increased to listing level or in severity, such that, ultimately, she was considered disabled.

35

The Eleventh Circuit has not yet addressed when an ALJ is required to obtain the advice of a medical expert.  However, several other circuit courts of appeal and at least one district court in the Eleventh Circuit have held that in cases where the ALJ finds the claimant to be disabled, the ALJ is required to obtain testimony of a medical expert if the medical record is ambiguous or otherwise inadequate to make a determination of the onset date.  *See Blea*, 466 F.3d at 911 (medical advisor required when onset date is ambiguous); *Spellman*, 1 F.3d at 362 (holding that medical expert necessary "in cases involving slowly progressive impairments, when the medical evidence regarding the onset date of a disability is ambiguous and the Secretary must infer the onset date"); *Delorme v. Sullivan*, 924 F.2d 841, 848 (9th Cir. 1991) (noting that pursuant to SSR 83-20, the ALJ should call on the services of a medical advisor to determine onset date if "the medical evidence is not definite concerning the onset date and medical inferences need to be made"); *see also McClanahan v. Comm'r of Social Sec.*, 193 Fed. Appx. 422, 428 (6th Cir. 2006 ) (requirement under SSR 83-20 that ALJ use medical expert "contemplates situations when an individual claims disability and there is no development of the medical record").

In *Spellman*, the claimant alleged a disability onset date of September 8, 1982, the date she stopped working due to physical impairments, as well as histrionic

personality disorder and depression.  *Spellman*, 1 F.3d at 359.  The Appeals Council found, however, that the first evidence of "a significant mental impairment" did not occur until April 1986, when she had her first consultative mental examination.  Although the claimant had previously been prescribed antidepressant and anti-anxiety drugs, based on the absence of indications in the claimant's medical reports that her functioning was impaired by her psychological conditions, the Appeals Council found that it was "reasonable to assume that [the claimant's] mental impairment was severe as of October 1, 1985, approximately six months prior to the April 29, 1986, psychological examination."  *Id*. at 362.

The claimant appealed, arguing that the Appeals Council failed to comply with SSR 83-20 "because its determination of the onset date of her disability was arbitrary, and therefore not based on an informed judgment."  *Id.* at 361-62.  The claimant argued that the Appeals Council should have consulted a medical advisor to determine her onset date.  *Id*.

The *Spellman* Court agreed, finding that the medical evidence regarding Plaintiff's onset date was ambiguous "because it is unclear when [the claimant's] mental impairment first restricted her functional capacity."  *Id*. at 363.  The court noted that although the claimant had not had a consultative mental examination earlier during

37

AO 72A
(Rev.8/8
2)

the disability period, she had been diagnosed and prescribed medication during the alleged period of disability. The court observed that:

> the Appeals Council failed to explain why October 1, 1985 was the proper onset date, and nothing in the record suggests that October 1, 1985 was significant with regard to Spellman's disability. That the Appeals Council arbitrarily selected an onset date six months prior to the first mental evaluation suggests that the medical evidence was ambiguous with regard to the onset date. The evidence in the record indicates that Spellman may have suffered from a disabling mental impairment before October 1, 1985. Spellman quit work on September 8, 1982. There is evidence that Spellman had been treated by physicians for depression and anxiety before April 1986.

*Id.* at 363. The court concluded that the Appeals Council "could not have inferred an onset date based on an informed judgment of the facts," as required by SSR 83-20, without consulting a medical advisor and remanded the case with instructions that the Commissioner consult a medical expert to determine the onset date of the claimant's disability. *Id.* at 363-64.

In *McManus v. Barnhart*, No. 5:04-CV-67-OC-GRJ, 2004 WL 3316303 (M.D. Fla. Dec. 14, 2004), the claimant alleged disability based on a variety of conditions, including systemic lupus and hypertension. After discussing other courts' applications of SSR 83-20, the *McManus* Court found that:

> Because the issue of onset is inextricably tied to the determination of disability in cases where the impairment is a slowly progressive condition that is not traumatic in origin, the Court concludes that the most logical

38

> interpretation of SSR 83-20 is to apply it to situations where the ALJ is
> called upon to make a retroactive inference regarding disability involving
> a slowly progressive impairment, and the medical evidence during the
> insured period is inadequate or ambiguous.   Accordingly, in those
> situations the ALJ should be required to obtain the advice of a medical
> advisor to assist the ALJ in making the determination from the available
> medical evidence of whether the slowly progressive impairment
> constituted a disability prior to the date last insured.

*McManus*, 2004 WL 3316303,  at * 6.

Similarly, the undersigned finds that the ALJ in Plaintiff's case could not have made an informed judgment as to Plaintiff's onset date without obtaining the testimony of a medical advisor.  While substantial evidence may support, but does not compel, a finding that Plaintiff was not disabled prior to November 26, 2002 (the date Dr. Ray completed a questionnaire indicating that Plaintiff was not "incapacitated" and was able to work, [*see* R386-87]),  Dr. Siddappa stated that he had treated Plaintiff since January 29, 2003, and that she suffered severe restrictions in her mental abilities and aptitude to perform unskilled work and marked functional limitations, limitations which would meet the requirements of Listing 12.04.  [*See* R377-79, 390].  Neither the questionnaire nor the letter from Dr. Siddappa, however, indicates when Plaintiff reached this level of severity.  Moreover, as Plaintiff correctly points out, [*see* Doc. 21 at 3], Dr. Siddappa found Plaintiff's current GAF score to be 49 and noted that her highest GAF for the previous year also was 49.  [*See* R374].  While a GAF score is in effect a snapshot of

a person's "overall psychological functioning" at or near the time of the evaluation, *see Martin v. Comm'r*, 61 Fed. Appx. 191, 194 n.2 (6th Cir. 2003); *see also* DSM-IV-TR at 32-34, Dr. Siddappa's evaluation demonstrates some consistency in the nature and duration of Plaintiff's impairment.  This evidence suggests that Plaintiff's mental impairments may have been severe and her functioning significantly impaired at least as early as October 2004, a year prior to Dr. Siddappa's assessment.

The ALJ relied on Plaintiff's "sporadic"mental health treatment prior to July 1, 2005, as grounds for not finding her disabled.  [*See* R22]. To the extent that the ALJ rejected Plaintiff's claims of a severe mental impairment based on the *lack* of mental health treatment, "lack of evidence alone is not sufficient to support a finding that an impairment did not exist at a disabling level of severity." *Spellman*. 1 F.3d at 363.  In *Lichter v. Bowen*, 814 F.2d 430 (7th Cir. 1987), the Seventh Circuit observed that even though the claimant had not sought professional mental health treatment prior to his alleged onset date, the ALJ's reliance on the date of the medical evaluation diagnosing psychiatric disorders was not supported by substantial evidence in light of the diagnosing physician's comment that the claimant's condition had begun at an earlier date.  *Id.* at 435-36.  Here, as discussed above, Dr. Siddappa's assessment and letter

suggest that Plaintiff suffered severe limitations from her mental impairments at an earlier date than that selected by the ALJ.

Moreover, because the record contains few treatment notes for the period between December 2003 and October 2005 (the date of Dr. Siddappa's report), it follows that there is no also medical evidence that indicates that July 1, 2005, a date three months prior to Dr. Siddappa's report, is the date that Plaintiff's condition deteriorated to the point that she was disabled.   Thus, the ALJ  appears to have arbitrarily selected July 1, 2005, as Plaintiff's onset date.  As noted by the *Spellman* Court, an arbitrary selection of an onset date suggests that the medical evidence was, in fact, ambiguous, and, therefore, that the ALJ was required to consult a medical advisor.  *See Spellman*, 1 F.3d at 363.

Finally, the ALJ's reliance on the state agency reviewing psychologist's February 2004 conclusion that Plaintiff could perform unskilled work does not satisfy SSR 83-20's requirement that the onset date must have a legitimate medical basis.  This report is based on medical evidence already on file and, therefore, does not address any time period between February 17, 2004, when the assessment was made, and July 1, 2005, the date selected by the ALJ.  [*See* R285-87].

41

This Court concludes that the medical evidence as to the onset date of Plaintiff's mental impairments is ambiguous and, therefore, under SSR 83-20, the ALJ should have consulted a medical advisor, rather than arbitrarily selecting a date three months prior to the date of Dr. Siddappa's evaluation as the date Plaintiff became disabled. Accordingly, this case is **REMANDED** in order for the Commissioner to receive and consider testimony from a medical advisor as to Plaintiff's onset date.  *See Bailey v. Chater*, 68 F.3d 75, 79 (4th Cir. 1995) ("[T]he date on which the synergy [of the claimant's impairments] reached disabling severity remains an enigma.  In the absence of clear evidence documenting the progression of [the claimant's] condition, the ALJ did not have the discretion to forgo consultation with a medical advisor."); *Spellman*, 1 F.3d at 363 (remand appropriate when Commissioner arbitrarily selected onset date).

Although the Court finds that remand is appropriate on this issue alone, it will address Plaintiff's remaining contentions.

B.      *Dr. Siddappa's Finding that Plaintiff Met Listing 12.04*

Plaintiff next argues that the ALJ erred by failing to provide any reasons for his implicit rejection of Dr. Siddappa's findings that Plaintiff's Major Depression met the criteria of Listing 12.04 for affective disorders.  Plaintiff contends that the ALJ's failure

42

to specify the weight given to a treating physician's opinion warrants remand. [Doc. 13 at 18-20].

The Commissioner does not dispute the assertion that, if accepted, Dr. Siddappa's assessment supports the finding that Plaintiff's depression meets Listing 12.04.[14]    Instead, the Commissioner argues that Dr. Siddappa's opinion that

_____

[14]    Listing 12.04 states:

Affective Disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome.  Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A. Medically documented persistence, either continuous or intermittent, of one of the following:

1. Depressive syndrome characterized by at least four of the following:

a. Anhedonia or pervasive loss of interest in almost all activities; or

b. Appetite disturbance with change in weight; or

c. Sleep disturbance; or

d. Psychomotor agitation or retardation; or

43

e. Decreased energy; or

f. Feelings of guilt or worthlessness; or

g. Difficulty concentrating or thinking; or

h. Thoughts of suicide; or

i. Hallucinations, delusions or paranoid thinking; . . . .

And

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration;

Or

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

44

Plaintiff met the Listing was given for the time period that the ALJ found Plaintiff to be disabled, but otherwise was inconsistent with the medical evidence for the time period prior to July 1, 2005.  The Commissioner further argues that even if the ALJ erred in determining that Plaintiff did not meet the Listing after July 2005, this would be harmless error since the ALJ found Plaintiff disabled after that date due to her mental impairments.  [Doc. 17 at 9].

A treating physician's opinion "'must be given substantial or considerable weight unless 'good cause' is shown to the contrary.'"  *Crawford v. Comm'r of Social Sec.*, 363 F.3d 1155, 1159 (11th Cir. 2004)  (quoting *Lewis*, 125 F.3d at 1440); *see also* 20 C.F.R. § 404.1527(d)(2).   Moreover, the ALJ "must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error." *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986);

---

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 CFR Pt. 404, Subpt. P, App. 1, § 12.04.

45

*see also Wiggins v. Schweiker*, 679 F.2d 1387, 1390 (11th Cir. 1982) (noting that ALJ's failure to mention treating physician's opinion constituted grounds for reversal).

Although inconsistencies with the record might be a valid basis for rejecting Dr. Siddappa's opinion for the period of time prior to July 1, 2005, as the Commissioner argues, *see Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003), the ALJ did not discuss his reasons for rejecting Dr. Siddappa's evaluation.[15] The ALJ merely stated that "I accept the opinions of reviewing state agency physicians and psychologists with regard to their finding that no listing is met or equaled." [R20]. Post-hoc rationalizations, such as that advanced by the Commissioner in this case, cannot be used to affirm the ALJ's decision. *Owens v. Heckler*, 748 F.2d 1511, 1516 (11th Cir. 1984) ("We decline . . . to affirm simply because some rationale might have supported the ALJ's conclusion. Such an approach would not advance the ends of reasoned decision making."); *see also Shinn v. Comm'r of Social Sec.*, 391 F.3d 1276, 1287 (11th Cir. 2004) (refusing to affirm ALJ decision based on two state agency consultative examinations that ALJ did not mention in his determination).

---

[15]     As discussed in § A, Dr. Siddappa did not explicitly state the time period for his assessment.

46

However, regarding the ALJ's failure to discuss his reasons for rejecting Dr. Siddappa's evaluation for the time period after July 1, 2005, the date he found Plaintiff to be disabled, the Court concludes that the error was harmless.  A claimant who is not currently engaged in substantial gainful employment and who is found to have a severe impairment which meets or equals a listing and satisfies the duration requirements is entitled to disability benefits without regard to whether or not she could return to her past work.  *Edwards v. Heckler*, 736 F.2d 625, 628 (11th Cir. 1984) (citing 20 C.F.R. § 404.1520)); *see also Durham v. Apfel*, 34 F. Supp. 2d 1373,  1381 (N.D. Ga. 1998) ("A claimant whose impairment meets a listing is disabled when not working, even if he or she worked in the past with the impairments, and even if he or she could return to his or her past work.") (citing *Ambers v. Heckler*, 736 F.2d 1467, 1469-70 (11th Cir. 1984)).

The ALJ concluded that Plaintiff could not sustain any work, including her past relevant work, due to her psychological limitations, after July 1, 2005.  [R22].  Thus, the ALJ concluded Plaintiff was disabled at step five of the sequential analysis rather than at step three, which would have been the case had he found that she met Listing 12.04.  However, because the Plaintiff received the same benefits whether she qualified at step three or at step five, any error the ALJ may have made in regard to rejecting

47

Dr. Siddappa's finding that Plaintiff met Listing 12.04 for time period after July 1, 2005 is harmless error.  *See Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983) (ALJ's mischaracterization of claimant's past work was harmless error, because such characterization of vocational factors was irrelevant where the ALJ found no severe impairment); *Curry v. Sullivan*, 925 F.2d 1127, 1131 (9th Cir. 1990) (errors that do not affect claimant's entitlement to benefits found harmless); *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) (court will not vacate a judgment unless the substantial rights of a party have been affected).

This Court already has concluded that this case should be remanded so that the Commissioner can receive a medical advisor's testimony regarding whether Plaintiff's onset date occurred prior to July 1, 2005.  Upon remand, the Commissioner also should reevaluate Dr. Siddappa's findings that Plaintiff met the criteria of Listing 12.04 prior to July 1, 2005, and if so chooses to reject those findings again in favor of the state agency reviewing psychologist's opinion, clearly articulate those reasons.  *See Lewis*, 125 F.3d at 1440 (ALJ must clearly articulate reasons for giving less weight to treating physician).

48

C.    *The ALJ's Failure to Comply with 20 C.F.R. § 404.1520a*

Plaintiff next argues that the ALJ failed to evaluate Plaintiff's severe mental impairments of major depressive disorder, obsessive compulsive disorder and bulimia nervosa and resulting functional limitations in accordance with the procedure set out in 20 C.F.R. § 404.1520a. Plaintiff contends that *Moore v. Barnhart*, 405 F.3d 1208, 1214 (11th Cir. 2005), requires the ALJ to conduct an analysis of the four factors set out in the regulation whenever a claimant establishes a "colorable claim of mental impairment." [Doc. 13 at 20].

The Commissioner concedes that the ALJ did not specifically evaluate each of the factors under § 404.1520a, but contends that the ALJ satisfied *Moore*'s requirements by incorporating the State agency psychologists' evaluation of the four factors into the decision. Therefore, the Commissioner contends that the ALJ's failure to include the factors in his decision was harmless error. [Doc. 17 at 10]. For the reasons set forth below, the Court finds that, under the circumstances of this case, the ALJ's reference to the state psychologists' evaluation does not satisfy the requirements of 20 C.F.R. § 404.1520a.

20 C.F.R. § 404.1520a provides a special technique for the evaluation of mental impairments. The ALJ first evaluates whether the claimant has a medically

49

determinable mental impairment.  If a medically determinable mental impairment is found, the ALJ then must "rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (c)" of the regulation. 20 C.F.R. § 404.1520a(c)(2).   Paragraph (c) identifies "four broad functional areas" to be considered, including: "[a]ctivities of daily living, social functioning; concentration, persistence or pace; and episodes of decompensation."  20 C.F.R. § 404.1520a(c)(3).  For the first three functional areas, an impairment may be rated as: none, mild, moderate, marked, and extreme.   For the fourth functional area, episodes of decompensation, a four point scale is utilized: none, one or two, three, four or more. 20 C.F.R. § 404.1520(c)(4).   Impairments rated as none or mild in the first three categories and "none" in the four category are generally considered not to be severe. 20 C.F.R. § 404.1520a (d)(1).  This special technique, incorporated into the form utilized by the ALJ to evaluate these functional areas, is commonly referred to as the Psychiatric Review Technique Form or "PRTF."  *Moore*, 405 F.3d at 1213-14.

The regulation requires that the ALJ document application of this technique in the written decision.  20 C.F.R. § 404.1520a(e)(2).  The regulation provides:

> At the . . . administrative law judge . . . level[] in claims adjudicated under the procedures in part 405 of this chapter, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and

> laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. § 404.1520(e)(2).

In *Moore*, the claimant, who alleged depression as a severe impairment, argued that a remand was mandated because the ALJ's failed to complete a PRTF or otherwise incorporate the analysis set forth in the 20 C.F.R. § 404.1520a. The Eleventh Circuit in *Moore* held that:

> We . . . join our sister circuits in holding that where a claimant has presented a colorable claim of mental impairment, the social security regulations require the ALJ to complete a PRTF and append it to the decision, or incorporate its mode of analysis into his findings and conclusions. Failure to do so requires remand.

*Moore*, 450 F.3d at 1214 (citations omitted).

Therefore, although the Commissioner argues that the ALJ's incorporation of the State agency psychologists' evaluation suffices, under both the plain language of the regulation and *Moore*, the ALJ must either complete the PRTF or explicitly analyze the four factors within the decision. In this case, the ALJ's obscure reference to PRTFs completed earlier in the administrative proceedings is plainly insufficient. One court has rejected the harmless error argument in relation to the application of the PRTF requirement as contrary to the purpose of the regulation. As pointed out by the Ninth

51

Circuit in *Selassie v. Barnhart*, 203 Fed. Appx. 174 (9th Cir. 2006), "one of the stated purposes for the "special technique" is to help the Social Security Administration " '[o]rganize and present [its] findings in a clear, concise, and consistent manner.' " *Selassie*, 203 Fed. Appx. at 176 (citing 20 C.F.R. § 404.1520a(a)(3)). The *Selassie* Court concluded that "[t]he specific documentation requirements . . . are not mere technicalities that can be ignored as long as the ALJ reaches the same result that it would have if it had followed those requirements." *Id.* Thus, the court rejected the Commissioner's argument that the ALJ's failure to document the application of the special technique in the decision was harmless error even where the ALJ would reached the same result had he followed the requirements of the regulation. *Id.*

The instant case demonstrates the importance of this regulation and clarity it requires in analyzing mental impairments. A review of the two PRTFs completed by the State agency psychologists reveals that their conclusions differed as to Plaintiff's limitations in maintaining concentration, persistence or pace. Dr. Carter's February 17, 2004, evaluation concluded that Plaintiff experienced moderate difficulties in maintaining concentration, persistence or pace, while the one performed by Dr. Hollender's September 30, 2003, evaluation noted only mild difficulties. *Compare* R192 *with* R281. Without the ALJ's individual personal analysis, or some acceptable

52

substitute not present in the administrative decision below, this Court cannot determine how the ALJ reconciled these findings.  Therefore, the Court is unable to determine whether the ALJ's failure to apply 20 C.F.R. § 404.1520a's special technique to the assessment of Plaintiff's mental impairments is harmless.  *Cf. Moore*, 405 F.3d at 1214 (ALJ's failure to consider two of the PRTF's functional areas prevented finding that failure to apply special technique was harmless).

Finally, even assuming *arguendo* that reference to these prior PRTFs could be considered sufficient to comply with the regulation, the Court notes that the latest PRTF was completed on February 17, 2004.  Because this assessment did not address Plaintiff's mental impairments and her functional limitations between February 17, 2004 and July 1, 2005, the ALJ's reliance on the PRTFs to establish Plaintiff's mental limitations during that period would not be supported by substantial evidence.  *See Gutierrez v. Apfel*, 199 F.3d 1048,  (9th Cir. 2000) (noting that PRTFs completed a year before the hearing before the ALJ did not satisfy requirements of 20 C.F.R. § 404.1520a)[16] (cited with approval in *Moore*, 405 F.3d at 1214).

---

[16]    The Ninth Circuit in *Selassie*, 203 Fed. Appx. at 176, noted that *Gutierrez*'s requirement, that an ALJ was required to fill out and attach a specified form, was superseded by amendments to § 404. 1520a since *Gutierrez* was decided, and as such, "have given the ALJ greater discretion in deciding how best to publish the mandated findings."   Nonetheless, the court concluded that,

Therefore, upon remand, the Commissioner should also evaluate Plaintiff's mental impairment in accordance with the procedures set forth in 20 C.F.R. § 404.1520a and required by the Eleventh circuit's *Moore* decision.

D.   *The ALJ's Credibility Finding and Consideration of Side Effects of Plaintiff's Medications*

Plaintiff contends that the ALJ's finding that her subjective allegations prior to July 1, 2005 "cannot be afforded complete credibility" is not supported by substantial evidence.  Plaintiff further argues that the ALJ failed to address her side effects of drowsiness and fatigue from her medication anywhere in the decision and, therefore, remand is required.  [Doc. 13 at 21-25].  The Commissioner responds that the ALJ

---

even under the amended version, the regulation requires the ALJ to follow the special technique and to "document application of the technique in the decision." 20 C.F.R. § 404.1520a(e). Specifically, the regulation requires the ALJ's decision to "include a specific finding as to the degree of limitation in each of the functional areas described" in the regulation. 20 C.F.R. § 404.1520a(e)(2). It is undisputed that the ALJ's decision in this case does not include specific findings related to the four functional areas described in § 1520a(c).

*Selassie*, *id.*  Although the Court has found no Eleventh Circuit case discussing the apparent superseding of the Ninth Circuit's *Gutierrez* opinion, like the court in *Selassie*, the undersigned concludes that the ALJ's discussion of the PRTF inadequate under the original or superseded version of § 404.1520a, as well as the eleventh Circuit's *Moore* decision.

54

properly evaluated the evidence, including the side effects of Plaintiff's medications. [Doc. 17 at 11].

"[C]redibility determinations are the province of the ALJ." *Moore*, 405 F.3d at 1212. The assessment of a claimant's credibility about her pain and other symptoms and their effect on her ability to function must be based on a consideration of all of the evidence in the case record. 20 C.F.R. §§ 404.1529(c), 416.929(c); SSR 96-7p. If the ALJ decides to discredit a claimant's subjective testimony, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Foote*, 67 F.3d at 1561-62 (citing *Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988)); *see also* 20 C.F.R. § 416.929; SSR 96-7p; *Kieser v. Barnhart*, 222 F. Supp. 2d 1298, 1310 (M.D. Fla. 2002). A broad statement rejecting a claimant's credibility is insufficient. *See Dyer*, 395 F.3d at 1210. A reviewing court will not disturb a clearly articulated credibility finding if there is substantial supporting evidence in the record. *Kieser*, 222 F. Supp. 2d. at 1310. However, "[i]f the ALJ does not articulate a reason for rejecting credibility, the Court cannot ascertain whether his finding is supported by substantial evidence." *Lorenzo v. Heckler*, 603 F. Supp. 189, 192 (S.D. Fla. 1985). Also, when an ALJ fails to state a reasonable basis for rejecting

55

the subjective testimony, the Eleventh Circuit requires that the testimony be accepted as true.  *See Foote*, 67 F.3d at 1562.

Because the undersigned has determined that this case should be remanded for further consideration of Plaintiff's onset date, Dr. Siddappa's finding that Plaintiff met Listing 12.04, and for the application of 20 C.F.R. § 404.1520a, the Court does not make an ultimate determination on the ALJ's credibility determination.  However, the undersigned notes that the ALJ's finding that Plaintiff received only "sporadic mental health treatment" from November 2002 through 2003, a factor upon which he based his credibility determination, may warrant reconsideration.  The Commissioner should also articulate reasons, if any exist, for rejecting Plaintiff's allegations regarding side effects from her medications.

First, the record indicates that Plaintiff had consistent mental health treatment from January 29, 2003 until January 29, 2004.  She appears to have been seen nearly every month between these dates.   [*See* R159-72, 196-205, 390].

The record contains no treatment notes after January 29, 2004, however.  An ALJ may rely on gaps in the medical record to draw the inference that a claimant would have secured more treatment had the impairment been as severe as alleged.  *See Irlanda-Ortiz v. Sec'y of Health and Human Svcs.*, 955 F.2d 765, 769 (1st Cir.

56

1991); *Cashman v. Shalala*, 817 F. Supp. 217, 224 (D. Mass. 1993) (ALJ may take into account gaps in treatment during the relevant time period in determining whether a claimant is disabled.). But, even where a claimant has not been treated at all for a substantial period of time, a gap in treatment will not automatically negate a finding of disability. *See, e.g., Shaw v. Chater*, 221 F.3d 126, 133 (2d Cir. 2000) (gap in treatment will not negate compelling evidence of disability in the record).

In this case it is not clear whether Plaintiff actually had a gap in her treatment. Dr. Siddappa indicated that he had treated Plaintiff from January 29, 2003, until November 18, 2005. [*See* R390]. Plaintiff further testified at the hearing that she had seen Dr. Siddappa every four to eight weeks since 2003. [R416]. The record also indicates that Plaintiff had been prescribed psychotropic medications, including Prozac, Seroquel, Klonopin and Paxil, during that period, which further indicates consistent mental health treatment. [*See* 376]. Therefore, upon remand, when evaluating Plaintiff's credibility, the Commissioner should inquire into whether Plaintiff continued to receive mental health treatment prior to July 1, 2005. The ALJ has a basic duty to fully develop the record, even if the Plaintiff is represented by counsel. *See Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981) (explaining that "[b]ecause a hearing before an ALJ is not an adversary proceeding, the ALJ has a basic obligation to develop

AO 72A
(Rev.8/8
2)

a full and fair record. . . .   This duty requires the ALJ to 'scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts' ").

Finally, Plaintiff testified during the hearing that she took Seroquel, Prozac, Laevis, and Klonopin.  [*See* R416-17].  While the ALJ mentions Plaintiff's testimony that her medications cause tiredness, sleepiness and Dr. Siddappa's opinion that her medications caused sedation, [*see* R21], nowhere does he address the impact of these side effects upon her functional capacity in the decision.  The ALJ must make a finding regarding the effect of a claimant's prescribed medications on her ability to work. *See McDevitt v. Comm'r of Social Sec.*, No. 07-10766, 2007 WL 2050910, at * 4 (11th Cir. July 18, 2007) (ALJ's determination that Plaintiff was not disabled not supported by substantial evidence in the absence of findings regarding claimant's allegations that medications caused severe concentration problems and drowsiness); *Cowart*, 662 F.2d at 737 ("The ALJ further failed in his duty to develop the record fully because he neither elicited testimony nor made any findings regarding the effect of Mrs. Cowart's prescribed medications upon her ability to work.").

Accordingly, upon remand, the Commissioner should make findings regarding the alleged side effects of Plaintiff's medications.

**VIII. CONCLUSION**

Pursuant to this Court's power to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g),[17] based on the foregoing discussion, the Court **REVERSES** and **REMANDS** the Commissioner's disability determination for proceedings consistent with this Opinion and Order. Upon remand, the Commissioner **SHALL** make further inquiry regarding Plaintiff's onset date by, including but not limited to, obtaining the advice of a medical expert as to the date of onset; articulate reasons for rejecting Dr. Siddappa's opinion that Plaintiff met Listing 12.04; and apply the special technique set forth in 20 C.F.R. § 404.1520a. In addition, the Commissioner should further reevaluate Plaintiff's credibility as to her subjective complaints of mental impairment and any non-exertional limitations from the side effects of her medication.

Pursuant to the Eleventh Circuit's suggestion in *Bergen v. Commissioner of Social Security*, 454 F.3d 1273, 1278 n.2 (11th Cir. 2006), Plaintiff **SHALL** have until **ninety (90) days** after he receives notice of any amount of past due benefits awarded

---

[17]   "The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title."  42 U.S.C. § 1383(c)(3).

AO 72A
(Rev.8/8
2)

to seek attorney's fees under the Social Security Act, 42 U.S.C. § 406(b).  *See also*

*Blitch v. Astrue*, No. 07-11298, 2008 WL 73668 at * 1 n.1 (11th Cir. Jan. 8, 2008).

The Clerk is **DIRECTED** to enter judgment for Plaintiff.

**IT IS SO ORDERED and DIRECTED**, this the 24th day of March, 2008.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

60